IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LIBERTARIAN PARTY OF ALABAMA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Hon. JOHN H. MERRILL, Secretary of )<br>State for the State of Alabama, )<br>)<br>Defendant. ) | Civil Action No.<br>2:19-cv-00069-ECM-SMD |

### **SECRETARY MERRILL'S MOTION TO DISMISS**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Secretary of State John H. Merrill moves to dismiss the Complaint, Doc. 1, for failure to state a claim upon which relief can be granted.

**I.     Background.**

The Libertarian Party of Alabama alleges that it violates the First and Fourteenth Amendments, facially and as applied, for Secretary Merrill to charge them approximately $34,000 for a statewide list of active and inactive registered voters while providing the same list to the Alabama Republican Party and the Alabama Democratic Party without charge. Doc. 1. Some context is in order.

**a.  Alabama's Voter Registration List.**

Alabama maintains a statewide voter registration system "for the conduct of all elections." Ala. Code § 17-4-33(a) & (a)(9). The list is statutorily required to contain, at a minimum, the name, addresses, voting location, and voting history of each registered voter in Alabama. Ala. Code § 17-4-33(a). While the list is maintained for the purpose of conducting elections, Ala. Code § 17-4-33(a)(9), *see also* Ala. Code § 17-1-3(b) & Ala. Code § 17-4-32, it contains information

that political parties, candidates, and others may find useful for political, commercial or other purposes. Recognizing the value of this proprietary information, the State has decided to make much of it available for sale and sometimes free of charge.

### b. Purchases of Alabama's Voter Registration List.

The Secretary of State's office "routinely receive[s] requests to purchase Alabama's voter registration list. The requests come from candidates for office – including candidates running under the Democratic and Republican party banners – as well as others." Decl. of Clay S. Helms, attached hereto as Exhibit 1, at ¶ 17. The list, and subsets of it, are sold for a penny a name or $1 per page, *id.* at ¶ 3, and requests for discounts have been rejected, *id.* at ¶ 18.

A spreadsheet reflecting some of the voter list purchases for 2018 includes "a statewide purchase for approximately $33,348, a purchase for approximately $23,000, two purchases that were more than $10,000 and less than $15,000, and five purchases that were more than $1,000 and less than $5,000. The remaining purchases varied from $1 to more than $900, with the majority being less than $100." Helms decl. at ¶ 19.

By statute, "[p]roceeds from the sale of tapes, discs, lists, labels, or other materials from the Secretary of State shall be retained by the Secretary of State for use in voter registration." Ala. Code § 17-4-38(d). "Revenue from lists sales contributes to pay for certain employee costs, election conference fees, training of county officials, travel costs for meetings of the Voter Registration Advisory Board, website domain renewals, and access to online court databases." Helms decl. at ¶ 21.

### c. Free Copies of Alabama's Voter Registration List.

Alabama law provides limited free copies of the voter registration list for designated entities and elected officials. Alabama's Administrative Office of Courts is allowed one free copy

per year "for its use in the production of a master jury list or for any other lawful purpose." Ala. Code § 17-4-38(f). Additionally, as part of maintaining the list, it may be shared with other States or groups of States. *See* Ala. Code § 17-4-38(g); Ala. Code § 17-4-38.1(b); Helms decl. at ¶ 24. Members of the Alabama Senate and the Alabama House receive a free copy of the voter registration list for their Senate District or House District, respectively, no later than 90 days after assuming office. Ala. Code § 17-4-38(e); Helms decl. at ¶ 25.

The provision challenged here provides that political parties that have ballot access in a state or county election may receive a list after each election and, upon written request, twice more per year. Ala. Code § 17-4-33(a)(10).[1] In practice, the Alabama Republican Party and the Alabama Democratic Party, which "routinely maintain statewide ballot access", Helms decl. at ¶ 6, are able to receive two copies of the statewide list by request in a year like 2019 (when no State and county elections are scheduled) and may receive those two copies plus copies after the Primary Election, Primary Runoff Election, and General Election in years like 2018 and 2020 (when State and county elections were/are scheduled), *id.* at ¶ 27.[2]

---

[1] Section 17-4-33(a)(10) provides: "Following each state and county election, the Secretary of State shall provide one electronic copy of the computerized voter list free of charge to *each political party that satisfied the ballot access requirements for that election*. The electronic copy of the computerized voter list shall be provided within 30 days of the certification of the election or upon the completion of the election vote history update following the election, whichever comes first. In addition, upon written request from the chair of a political party, the Secretary of State shall furnish up to two additional electronic copies of the computerized voter file during each calendar year to each political party that satisfied the ballot access requirements during the last statewide election held prior to that calendar year. The electronic copies provided pursuant to this section shall contain the full, editable data as it exists in the computerized voter list maintained by the Secretary of State." Ala. Code § 17-4-33(a)(10) (emphasis added).

[2] The Primary Election and Primary Runoff Election are elections of the political parties for the purposes of selecting their nominees in the General Election and filling various party offices. *See* Ala. Code § 17-13-1. The State runs the elections for the parties. *See* Ala. Code § 17-13-1; Helms decl. at ¶ 29.

3

### d. The Libertarian Party of Alabama.

The Libertarian Party of Alabama has not had statewide ballot access since 2002. Doc. 1 at ¶ 3. Plaintiff alleges that it "ran four candidates for local elective office in Alabama" in 2018, *id.*, but does not say for which offices or allege that it sought free voter registration lists for any State or county jurisdiction on the basis of this unspecified ballot access.

The Secretary of State's office has determined that the party fielded candidates for two House Districts in 2018, and has today emailed the party the lists of active and inactive voters for those Districts. Helms decl. at ¶ 31 .

"If the Libertarian Party had ballot access for any other State or county office in 2018, it" should contact the Secretary of State's office to "request a list of active and inactive registered voters for the specific jurisdiction(s) for which it had ballot access." Helms decl. at ¶ 31. The office "will then seek to confirm that the Libertarian Party had such access and, if it did, provide up to two copies of the list this year for no charge." *Id*.

If the Libertarian Party of Alabama wants the entire statewide list of active and inactive registered voters, that list contained 3,474,126 as of February 13, 2019, Helms decl. at ¶ 9. Thus, the cost for approximately 3.4 million voters' information is approximately $34,000. *Id.* Given that the Libertarian Party of Alabama is entitled to a free list for some portions of the State, as just described, it could order the statewide list minus those jurisdictions, thereby saving money. *Id.* at ¶ 31.

### e. Drawing the Line at Ballot Access.

Again, Ala. Code § 17-4-33(a)(10) – in contrast to the Complaint, Doc. 1, at 2, 13 & ¶¶ 3, 23-25, 34 (positing "minor or small political parties" against "major parties") – is not written in terms of Republicans and Democrats on the one hand and minor political parties on the other.

With respect to free copies for political parties, the line is drawn at ballot access. A political party without ballot access is treated like the rest of the general public, Ala. Code § 17-4-33 & Ala. Code § 17-4-38, including businesses with an interest in reaching potential customers as well as candidates and political action committees with an interest in influencing public discourse and elections. This is consistent with the fact that Alabama's Election Code generally is not written in terms of major parties and minor parties, but in terms of ballot access.

The Republican and Democratic parties achieve ballot access for each forthcoming statewide election by receiving more than 20% of the vote in the State for the prior general election. *See* Ala. Code § 17-13-40; Helms decl. at ¶ 6. This is how the Libertarian Party of Alabama achieved ballot access more than 15 years ago for the 2002 election cycle. Doc. 1 at ¶ 3. Ballot access may also be achieved in this way at the county level. Ala. Code § 17-13-40.

For parties who are not already on the ballot, ballot access can be secured by filing a petition containing "the signatures of at least three percent of the qualified electors who cast ballots for the office of Governor in the last general election for the state, county, city, district, or other political subdivision in which the political party seeks to qualify candidates for office . . . ," Ala. Code § 17-6-22(a)(1), and meeting other requirements, Ala. Code § 17-6-22(a)(2). The Libertarian Party of Alabama petitioned for ballot access for the 2000 elections, Doc. 1 at ¶ 3, and apparently intends to do the same for the 2020 elections, Doc. 1 at ¶ 11. Alabama's petition requirements have previously been challenged in the federal court and upheld. *E.g., Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007); *Stein v. Ala. Sec'y of State*, 774 F.3d 689 (11th Cir. 2014). They are not challenged here.

Drawing the line at ballot access is an "administratively useful" place to draw it. Helms decl. at ¶ 35. "This line is objective and does not require setting any new standard or conducting

any sort of investigation to determine whether the new standard has been met." *Id*. Moreover, preparing and distributing voter registration lists is just one of the many things that the Elections Division within the Secretary of State's office does. *Id*. at ¶ 33. "If the voter registration list were available to more people/entities for free, it could become difficult" for the Elections Division "to keep up with demand while meeting [its] other elections responsibilities." *Id*. at ¶ 34. Drawing the line at ballot access also requires a level of electoral support before State resources are committed to assisting a political party through provision of proprietary information at no charge.

## II.     Standard of Review.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). This rule "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## III.    Plaintiff's Complaint Fails to State a Claim Upon Which Relief Can Be Granted.

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas. As a result, political parties' government, structure, and activities enjoy constitutional protection." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357-58 (1997). "On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358 (internal citations and parentheticals omitted).

Here, Alabama treats political parties that have ballot access in State and county elections differently from all other entities, including political parties that do not have said ballot access. This is a burden on the constitutional rights of the Libertarian Party of Alabama. As explained by

the Eleventh Circuit just last week, the legal analysis focuses on that burden and on the State's interests:

> We evaluate the constitutionality of a challenged election law by applying the *Anderson-Burdick* test. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). That test requires us to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights. *See Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434.
>
> A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law. *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

*Democratic Exec. Comm. of Fla. v. Lee*, ___ F.3d ___, 2019 WL 638722, *4 (11th Cir. 2019) (footnote concerning Equal Protection Clause claim omitted).[3]

### a. Assessing the Burden: *Timmons* and *Stein*.

The Supreme Court's analysis in *Timmons* is helpful in evaluating the burden here. In *Timmons*, the Court dealt with a challenge to Minnesota's anti-fusion law, which prohibited a candidate from appearing on the ballot as the candidate for more than one political party. *Timmons*, 520 U.S. at 353-54. The Court summarized its discussion of the burden as follows: "In sum,

---

[3] To the extent that the Complaint is read to include an Equal Protection Clause claim, the analysis is no different. *De La Fuente v. Merrill*, 214 F. Supp. 3d 1241, 1258-59 (M.D. Ala. 2016). "The *Anderson* standard proved so useful in the associational-rights context that the Court ultimately closed the loop and began using *Anderson* to analyze whether state election laws violated the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 1259. This statement does not, of course, include Equal Protection Clause claims alleging discriminatory intent, *Democratic Exec. Comm. of Fla*, 2019 WL 638722 at *5 n. 9, but the Complaint here contains no such allegations, *see* Doc. 1, generally.

7

Minnesota's laws do not restrict the ability of the New Party and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the party's access to the ballot. They are silent on parties' internal structure, governance, and policymaking.  Instead, these provisions reduce the universe of potential candidates who may appear on the ballot as the party's nominee only by ruling out those few individuals who both have already agreed to be another party's candidate and also, if forced to choose, themselves prefer that other party. They also limit, slightly, the party's ability to send a message to the voters and to its preferred candidates. We conclude that the burdens Minnesota imposes on the party's First and Fourteenth Amendment associational rights—though not trivial—are not severe." *Timmons*, 520 U.S. at 363.

Similarly, Alabama's provisions governing the distribution of the voter registration list "do not restrict the ability of the" Libertarian Party of Alabama "and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the party's access to the ballot. They are silent on parties' internal structure, governance, and policymaking." *See Timmons*, 520 U.S. at 363.  And, in fact, they do not even limit who may appear on the ballot, should the party achieve ballot access, or any message that the party would want to send on the ballot itself.  Instead, the restriction is only that the Libertarian Party of Alabama must pay a fee for the voter registration list – as most people and entities who want it do.

The *Stein* case which arose in this Court and involved the Libertarian Party of Alabama is also helpful.  *Stein v. Ala. Sec'y of State*, 774 F.3d 689 (11th Cir. 2014).  In *Stein*, the plaintiffs challenged Alabama's ballot access requirements insofar as they wanted their Presidential candidates to bear their party labels even though they had not achieved statewide party access. *See id.*, generally; *see also* Ala. Code § 17-14-31(a).  Judge Watkins' opinion, which was adopted by the Eleventh Circuit, *Stein*, 774 F.3d at 691, noted that the law challenged there did not restrict the

8

plaintiffs' use of "time-tested campaigning tools" like "commercials, signs, speeches, debates, town-hall meetings, endorsements, canvassing, social networking, websites, newsletters, bumper stickers, handshaking, baby-kissing, robodialing, leafleting, good-old-fashioned stumping, *etc.,*" *Stein,* 774 F.3d at 695 n. 7 (District Court opinion).  Likewise, all of those options remain available to the Libertarian Party of Alabama.  Indeed, they can even use the voter registration list or a subset of it to further these activities, they just have to pay for list where they have not achieved ballot access in a State or county election.

### b.  *Socialist Workers Party.*

Turning to voter list cases, in *Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984 (S.D.N.Y. 1970) (3-judge court), a three-judge court considered, *inter alia*, New York laws that required voter registration lists be delivered to political parties that had at least 50,000 votes for governor in the last general election for that office and made copies of the list available for inspection or purchase by others.  314 F. Supp. at 995. The court explained:

> It is clear that the effect of these provisions, when considered with other sections of the Election Law, is to deny independent or minority parties *which have succeeded in gaining a position on the ballot* but which have not polled 50,000 votes for governor in the last preceding gubernatorial election an equal opportunity to win the votes of the electorate. The State has shown no compelling state interest nor even a justifiable purpose for granting what, in effect, is a significant subsidy only to those parties which have least need therefor. *See Madole v. Barnes*, 20 N.Y.2d 169, 282 N.Y.S.2d 225, 229 N.E.2d 20 (1967).
>
> In opposition to plaintiffs' contention, the State argues that 'one can readily imagine the heavy burden and expense that would be placed upon the State if it were required to provide every group, of whatever size, that purported to be a political party, free copies of voting lists. This, however, overlooks one fact and misconstrues another. Firstly, plaintiffs have acknowledged that these lists should not be furnished indiscriminately at government expense to anyone requesting them. What they seek bestowed upon any party which complies with State requirements for placing its candidates before the electorate, is the same benefit granted to major political parties of not having to purchase such lists at considerable expense. Secondly, constitutional strictures merely require that the State treat all groups similarly situated alike. The State is not required to provide such lists free

>of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them.

*Socialist Workers Party*, 314 F. Supp. at 995-96 (footnotes omitted; emphasis added). On direct appeal to the Supreme Court, the decision was summarily affirmed. *Rockefeller v. Socialist Workers Party*, 400 U.S. 806 (1970).

### i. State Interests in Drawing the Line at Ballot Access.

The District Court's analysis in *Socialist Workers Party* is helpful for a couple of reasons. First, the New York laws are distinguishable from Alabama's law because New York did not draw the line at ballot access. Instead, as emphasized in the quote above, New York denied the list to political parties that had achieved ballot access but had not received a certain number of votes. *Socialist Workers Party*, 314 F. Supp. at 995.

Alabama draws the line at ballot access. "It is administratively useful to draw a line on free copies for political parties at whether they have achieved ballot access. This line is objective and does not require setting any new standard or conducting any sort of investigation to determine whether the new standard has been met." Helms decl. at ¶ 35. It also keeps the number of requests from growing beyond a manageable level. *See id*. at ¶ 34. Federal courts have recognized administrative interests as an important State interests. *Swanson v. Worley*, 490 F.3d 894, 912 n.18 (11th Cir. 2007); *Stein*, 774 F.3d at 701 (District Court opinion).

Alabama's ballot access line also requires that a political party have achieved a certain level of electoral support before valuable State resources are handed over without compensation to the taxpayers. *Cf. Timmons,* 520 U.S. at 366 ("The State surely has a valid interest in making sure that minor and third parties who are granted access to the ballot are bona fide and actually supported, on their own merits, by those who have provided the statutorily required petition or ballot support."); *Moderate Party of Rhode Island v. Lynch*, 764 F. Supp. 2d 373, 378 (D.R.I.

2011) (The Supreme Court in *Buckley v. Valeo*, which addressed public financing of campaigns, "further held that—in view of important governmental interests against 'funding hopeless candidacies with large sums of public money' and 'providing artificial incentives to splintered parties and unrestrained factionalism'—it is permissible to condition the receipt of public funding on a 'preliminary showing of a significant modicum of support.'")) (*quoting Buckley v. Valeo*, 424 U.S. 1 (1976), which was *quoting Storer v. Brown*, 415 U.S. 724 (1974), and *Jenness v. Fortson*, 403 U.S. 431 (1971)).

Moreover, because a political party can both earn and buy a free voter registration list at less than the statewide level, Helms decl. at ¶¶ 11-12, 31, the Libertarian Party of Alabama does not face a $34,000 price tag and a take-it-or-leave-it option. The party can build on its successes over time through free lists where it has achieved ballot access in a State or county election and through the purchase of subsets of the list that meet its budget. This factor both reduces the burden on the Libertarian Party of Alabama and supports Alabama's interest in only providing free voter registration lists to an objectively identifiable and reasonably-sized group of entities for which no new standards are needed and which have demonstrated relevant electoral support.

### ii. The Facial Challenge.

The second reason *Socialist Workers Party* is helpful is because the plaintiffs there concede something the Libertarian Party of Alabama does not: the State is not required to hand a free copy of the list over for free to anyone who has use – or even desire – for it. *Compare Socialist Workers Party*, 314 F. Supp. at 996 *with* Doc. 1 at 1 & ¶¶ 34-35 (asserting a facial challenge).

Alabama's voter registration list is proprietary information that the State is permitted to sell, just as any business would be. There is nothing constitutionally problematic about requiring purchase by political action committees or private businesses that want the information, or in

requiring purchase by candidates who want the information. While the Equal Protection Clause directs that groups or "persons similarly situated should be treated alike," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), none of these persons or entities are political parties at all, much less political parties with ballot access. And private businesses looking to market to customers certainly have no First Amendment right of association to a free copy of the State's voter registration list.

Thus, the Constitution plainly does not require the Secretary to hand out the voter registration list for free to just anyone because political parties with proven track records of popular support receive the list for free. Accordingly, the Libertarian Party's facial challenge to Ala. Code § 17-4-33(a)(10) and Ala. Code § 17-4-38 fails because the laws are not invalid in all circumstances and they have a "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (*quoting Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 *1997) (Stevens, J., concurring in the judgments) (internal quotation marks omitted by the *Stevens* Court)).

### iii. Subsequent Events.

Years after *Socialist Workers Party*, New York apparently reenacted the same laws held unconstitutional therein, and, in *Schulz v. Williams*, 44 F.3d 48 (2d Cir. 1994), the reenacted laws were struck down on the authority of the Supreme Court's summary affirmance in *Rockefeller*, 400 U.S. 806. *Schulz*, 44 F.3d at 59-61.

Thereafter, the Rhode Island District Court shared its view that *Socialist Workers Party* was "decided before the Supreme Court elaborated the proper standard of review of election laws in *Anderson v. Celebrezze* and *Burdick v. Takushi*, and . . . applied strict scrutiny or something akin to it." *Moderate Party of Rhode Island v. Lynch*, 764 F.Supp.2d 373, 380 n.5 (D.R.I. 2011).

### c. Additional Cases.

We are aware that a District Court in Indiana granted the voter registration list to the New Alliance and Libertarian parties in *Libertarian Party of Indiana v. Marion County Board of Voter Registration*, 778 F. Supp. 1458 (S.D. Ind. 1991). In that case, the State interests were not sufficiently developed and the plaintiffs' status as "bona fide political parties" was unchallenged. *Id.* at 1462, 1464. Additionally, the court was troubled that the statute was "discriminatory in the sense that it favors the two largest political parties." *Id.* at 1463.

However, the Supreme Court has explained that "States need not remove all of the many hurdles third parties face in the American political arena today." *Timmons*, 520 U.S. at 367. Thus, in that case, "the Constitution [did] not require States to permit fusion any more than it requires them to move to proportional-representation elections or public financing of campaigns." *Id.* at 362. Similarly here, the State is not required to help the Libertarian Party of Alabama (or any other political group) achieve either ballot access or electoral success. Indeed, Alabama has "a strong interest in the stability of [its] political system[]." *Id.* at 366. While this interest has its limits, it does permit Alabama "to enact reasonable election regulations that may, in practice, favor the traditional two-party system . . . ." *Id.* at 367.[4]

---

[4] The entire paragraph, minus footnotes, citations, and parentheticals says: "States also have a strong interest in the stability of their political systems. This interest does not permit a State to completely insulate the two-party system from minor parties' or independent candidates' competition and influence, nor is it a paternalistic license for States to protect political parties from the consequences of their own internal disagreements. That said, the States' interest permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system, and that temper the destabilizing effects of party-splintering and excessive factionalism. The Constitution permits the Minnesota Legislature to decide that political stability is best served through a healthy two-party system. And while an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions, States need not remove all of the many hurdles third parties face in the American political arena today." *Timmons*, 520 U.S. at 366-67 (footnotes, citations and parentheticals omitted).

13

Plaintiffs may rely on *Council of Alternative Political Parties v. State of New Jersey, Division of Elections*, 344 N.J. Super. 225 (N.J. Super. Ct. App. Div. 2001), and *Green Party of Michigan v. Land*, 541 F.Supp.2d 912 (E.D. Mich. 2008). In both cases, the courts focused on the value of having party affiliation information above and beyond a voter registration list or a list of voters in a primary. *CAPP,* 344 N.J. Super. at 242; *Green Party of Mich.*, 541 F.Supp.2d at 918. By contrast, the Complaint here is not squarely focused on political affiliation, and, instead, concerns voter registration lists more generally. *See* Doc. 1, generally. While we recognize the cases were resolved in the plaintiffs' favor, they deal with different fact scenarios and are not binding here.

### d. The Choices of Other States.

Finally, we note that the Complaint alleges that the price for Alabama's statewide voter list "is far higher than any fee for a voter registration list charged by just about any other State in the nation, many of which provide them entirely free of charge." Doc. 1 at ¶ 26. Even assuming that is true, it is not relevant.

In a ballot access case, the Eleventh Circuit reiterated "that the legislative choices of other states are irrelevant, however, because a court is 'no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature.'" *Swanson v. Worley*, 490 F.3d 894, 910 (11th Cir. 2007) (*quoting Libertarian Party of Fla. v. State of Fla.*, 710 F.2d 790, 794 (11th Cir. 1983)). Accordingly, what other States charge is not relevant.

### IV. Conclusion.

For the foregoing reasons, the burden on the Libertarian Party of Alabama here is minimal and the State's interests are sufficiently strong to justify the burden. Thus, the party has not stated

a claim upon which relief can be granted as to it. Moreover, the law is facially valid. The Court, therefore, should dismiss both the as-applied and facial challenges the party has brought against Ala. Code § 17-4-33(a)(10) and Ala. Code § 17-4-38.

        Respectfully submitted,

        STEVE MARSHALL
        *Attorney General*

        BY:

        s/ Misty S. Fairbanks Messick
        Winfield J. Sinclair (ASB-1750-S81W)
        Misty S. Fairbanks Messick (ASB-1813-T71F)
        *Assistant Attorneys General*

        **OFFICE OF THE ATTORNEY GENERAL**
        501 Washington Avenue
        Montgomery, Alabama 36130
        Telephone: (334) 242-7300
        Facsimile: (334) 353-8440
        wsinclair@ago.state.al.us
        mmessick@ago.state.al.us
        ***Attorneys for the Secretary of State***

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on the 19th day of February 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

David I. Schoen
Attorney at Law
28000 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
DSchoen593@aol.com

        s/ Misty S. Fairbanks Messick
        Of Counsel