IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LIBERTARIAN PARTY OF ALABAMA  :
                              :
            Plaintiff,        :
                              :
v.                            :        Civil Action No. 2:19-cv-00069-ECM-SMD
                              :
JOHN HAROLD MERRILL,          :
Secretary of State for the State of Alabama,  :
                              :
            Defendant.        :

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF## 28-30]

COMES NOW the Plaintiff, Libertarian Party of Alabama ("LPA"), by and through the undersigned counsel, and hereby provides its response to the Defendant's motion for summary judgment.

## SOME FUNDAMENTAL RELEVANT AMERICAN PRINCIPLES

**For more than two decades, this Court has recognized the constitutional right of citizens to create and develop new political parties. The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences**.

*Norman v. Reed*, 502 U.S. 279, 288 (1992).

**There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.**

*Williams v. Rhodes*, 393 U.S. 23, 32 (1968)

**When the variety and number of political parties increases, the chance of oppression, factionalism, and non-critical acceptance of ideas decreases.**

*James Madison*

**In our political life, third parties are often important channels through which political dissent is aired: "All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, which innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. . . . The absence of such voices would be a symptom of grave illness in our society."**

*Willams v. Rhodes*, 393 U.S. 23, 39 (Douglas, J., Concurring), *quoting from, Sweezy v. New*

*Hampshire*, 354 U.S. 234, 250-251 (1957)

**Although the State has a legitimate -- and indeed critical -- role to play in regulating elections, it must be recognized that it is not a wholly independent or neutral arbiter. Rather, the State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit. Recognition of that basic reality need not render suspect most electoral regulations. Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.**

*Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., Concurring).

**"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."**
*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)

## INTRODUCTION

This case presents a simple, straightforward, single legal issue: whether it violates the First and Fourteenth Amendments to the United States Constitution for Alabama to discriminate against minor political parties by charging such minor political parties an exorbitant fee (over $34,000) to obtain the State's computerized voter registration lists, paid for by Alabama's taxpayers, while providing it for free to the major parties (Democrats and Republicans). This issue has been resolved in favor of the Plaintiff's position by each court that has considered it, in a history of unbroken decisions extending back some 50 years.

The Defendant not only fails to concede the issue, he now actually has filed a motion for summary judgment urging the Court to rule in his favor as a matter of law. The Defendant's motion raises specious issues, most of which are completely irrelevant to the actual legal considerations attending this constitutional issue, and he supports his motion with an "expert" opinion from an academic who simply does not think minor political parties have a meaningful role to play in our political system. Her view, her antipathy toward minor parties, and her opinions have absolutely no bearing on the actual legal issue to be decided.

Our courts long ago settled that minor parties play a significant role in our political system and that their participation in the process implicates fundamental constitutional rights of candidates who seek to run under a minor party banner and voters who wish to cast their vote for a minor party candidate and otherwise support minor political parties.

The thrust of the Defendant's like-minded "expert's" argument is that the courts are wrong to even recognize this discrimination as such. In her world of wishes, there is no reason to care about minor party candidates or their supporters or take any steps to ensure they have a fair

chance at gaining ballot access.  They just do not matter.  And if they were to get on the ballot, the ballot might then be overcrowded.  Her position might have some significance if she were able to design her own political system; but thank G-d, in our system, her views are anathema and are inconsistent with a fully developed body of case law that applies to the voter registration list scenario present here and to third-party constitutional jurisprudence more broadly.

The Defendant's arguments, through his "expert" are completely circular, reward onerous ballot access laws, seek to maintain the status quo, favoring the two major parties, and, to the extent the concern with giving broader access to Alabama's voter registration list could lead to ballot overcrowding, this just emphasizes the obvious importance of the voter registration list to a minor party's ability to get on the ballot and exercise the constitutional rights guaranteed to the party, its members and candidates, and Alabama voters who support them.

Defendant's motion follows months of depositions, he insisted on taking solely for the purpose of harassing and intimidating various members of the LPA, suggesting in questions that they had done something wrong, when they clearly had not, and making them miss work and travel long distances to sit for the depositions, which consisted mostly of hours long questioning on subjects that were legally irrelevant.  This is not a fact-intensive case and any fact discovery could have been done through far less burdensome and far less costly means.

Defendant's motion for summary judgment follows his earlier Rule 12(b)(6) motion to dismiss [ECF# 5] and has absolutely no more merit than that earlier motion.  The primary difference in the motions is that the Defendant now somehow has found some new purported interests that he claims supports his discrimination against minor parties, not one of which is a legitimate, legally cognizable or factually supported state interest.  They were desperately

fabricated out of whole cloth to try improperly to argue against well settled consistent authority on the actual legal issue before the Court.  It is patently obvious that not one of the new purported state interests Defendant has concocted justifies the discrimination and the burden the discrimination imposes on minor political parties and their ability to organize, gain ballot access, meaningfully put forward their political message or win elections.

The Defendant's motion for summary judgment must be denied.  Instead, the Court should resolve this case and the simple, direct, single issue it raises now, once and for all, by granting summary judgment to the non-moving Plaintiff as a matter of law, pursuant to Rule 56(f)(1) of the Federal Rules of Civil Procedure.  *Artistic Entm't v. City of Warner Robins*, 331 F.3d 1196, 1201-1202 (2003), *rehearing, en banc, denied* by *Artistic Entm't, Inc. v. City of Warner Robins*, 87 Fed. Appx. 716 (2003), *certiorari denied* by *Artistic Entm't, Inc. v. City of Warner Robins*, 2004 U.S. LEXIS 2766 (U.S., Apr. 19, 2004); 11 *Moore's Federal Practice Civil* §56.71.

In the pages that follow, Plaintiff will provide the relevant background concerning the voter registration list, its recipients, its importance to the LPA, the legal standard under which this motion is to be analyzed, a discussion of the relevant body of law that deals directly with the issue in this case, analysis under the *Anderson/Burdick* framework, and finally some miscellaneous responses to the Defendant's memorandum in support of his motion:

### Background Relevant to the Voter Registration List

**The Relevant Statute:**

Alabama Code Section 17-4-33 provides in pertinent part as follows:

**§ 17-4-33. Computerized statewide voter registration list.**

(a) The State of Alabama shall provide, through the Secretary of State, a nondiscriminatory, single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered by the Secretary of State, with advice from the Voter Registration Advisory Board and the President of the Alabama Probate Judges Association, which contains the name and registration information of every legally registered voter in the state. The computerized list shall comply with the following requirements:

(1) It shall serve as the single system for storing and managing the official list of registered voters throughout the state.

(2) It shall contain the name, address, and voting location, as well as other information deemed necessary by the Voter Registration Advisory Board or the Secretary of State, of every legally registered voter in the state.

(3) A unique identifier shall be assigned to each legally registered voter in the state.

(4) It shall contain the voting history of each registered voter.

(5) It shall be coordinated with the driver's license database of the Department of Public Safety and the appropriate state agency to assist in the removal of deceased voters.

(6) Any election official in the state, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.

(7) All voter registration information obtained by any registrar in the state shall be electronically entered into the computerized list on an expedited basis at the time information is provided to the registrar.

(8) The Secretary of State shall provide such support as may be required so that registrars are able to enter voter registration information.

(9) It shall serve as the official voter registration list for the conduct of all elections.

**(10) Following each state and county election, the Secretary of State shall provide one electronic copy of the computerized voter list free of charge to each political party that satisfied the ballot access requirements for that election. The electronic copy of the computerized voter list shall be provided within 30 days of the certification of the election or upon the completion of the election vote history update following the election, whichever comes first. In addition, upon written request from the chair of a political party, the Secretary of State shall furnish up to two additional electronic copies of the computerized voter file during each calendar year to each political party that satisfied the ballot access requirements during the last statewide election held prior to that calendar year. The electronic copies provided pursuant to this section shall contain the full, editable data as it exists in the computerized voter list maintained by the Secretary of State.**

(11) The list shall be maintained so that it is technologically secure.  (Emphasis added)

Alabama Code Section 17-4-38 provides in pertinent part as follows:

**§ 17-4-38. Dissemination of information on voter registration.**

(a) The Secretary of State shall ensure that all applicants obtain requested voter lists in a timely manner. Methods shall be established for the transmission of tapes, discs, or lists to any applicant. Hindrances shall not be created or devised to delay transmission of tapes, discs, or lists

to any applicant.

(b) Except as provided in this section, there shall be a uniform charge for the production of voter lists. The reproduction costs of the basic electronic copy of the statewide file shall be reasonable as determined by the Secretary of State and a fee schedule shall be conspicuously posted in the office of the Secretary of State. Costs of printed copies of lists are as otherwise provided by law.

© Access to the lists and voter history information contained on the central computer in the office of the Secretary of State is accessible to anyone making application, except Social Security numbers which are not to be released.

(d) Proceeds from the sale of tapes, discs, lists, labels, or other materials from the Secretary of State shall be retained by the Secretary of State for use in voter registration.

(e) The Secretary of State shall provide, without charge, each legislator one copy of the voter list in his or her district within 90 days of his or her assuming office.

(f) Upon application and without charge, the Administrative Office of Courts shall be provided with an electronic copy of the statewide voter list no more than once a year for its use in the production of a master jury list or for any other lawful purpose.

(g) Upon application and without charge, the chief elections officer of any other state shall be provided with an electronic copy of the statewide voter list no more than once a year for any lawful purpose, on the condition that the chief elections officer of the requesting state agrees to reciprocate and provide a copy of the statewide voter list of that state to the chief elections officer of this state upon request and without charge, to be used for any lawful purpose. The Secretary of State may enter into an agreement with any other state, at any time, regarding the exchange of statewide voter lists.

(h) Resale of any portion of the list by the Administrative Office of Courts, or the office of the chief elections officer of any other state, shall be strictly prohibited.


Particularly relevant here, for a minor political party seeking ballot access signatures, trying to reach voters personally to familiarize them with the Party's platform and candidates, and campaigning for votes, the voter registration list must contain, *inter alia*, the name, address, and voting location for each registered voter and each voter's voting history.  §17-4-33(2)&(4).

**The Defendant Provides the Voter Registration List, Paid For by Alabama Taxpayers, Free of Charge to Many People, Groups, and Agencies Inside and Outside of Alabama, in Addition  Addition to the Democratic and Republican Parties, While Charging Alabama <u>Minor Political Parties Over $34,000.</u>**

The voter registration list compiled and maintained by the Defendant is used

as the official list at voting locations to determine who is eligible to cast a vote in any given election and officials at each local election location have full access to all statewide voter registration information.  §17-4-33(9); [ECF# 12 at ¶7].

The Defendant is required by Alabama law to compile and maintain a current statewide voter registration list at public expense and to maintain it in electronic/digital format.  *See e.g.,* §17-4-38.1, Code of Alabama.

In addition to the major political parties, which get copies of the statewide voter registration list for free under §17-4-33(10), the Administrative Office of the Courts gets a free statewide voter registration list each year to use for any lawful purpose it wishes.  §17-4-38(f). Additionally, any chief elections of any one or of all 50 states, can have a free copy of Alabama's statewide voter registration list, simply by asking for it and agreeing to reciprocate with a free copy of their state's list and the Defendant is free to enter into any agreement he likes with any other state regarding the exchange of voter registration lists.  §17-4-38(g). [ECF# 12 at ¶18]

In addition, the Defendant has acknowledged that he also provides the computerized statewide voter registration list or "immediate electronic access to the information in it" free of charge to any election official in the state under 52 U.S.C. §21083(a)(1)(A)(v) and (viii) and coordinates the computerized list and provides it for free with a whole host of other state agencies, including the head of the state motor vehicle authority. [ECF# 28-2 at 143].

Interestingly, the Defendant asserts that he provides the foregoing parties with a free copy of the statewide voter registration list pursuant to what he characterizes as the state's "interest in complying with all State and federal laws impacting voter registration," and he specifically cites his interest in complying with the "Help America Vote Act." ("HAVA") [ECF# 28-2 at 142]

8

This assertion is disingenuous at best and the Defendant's "interest in complying" with the HAVA would appear to be relatively new.

In a 2006 case filed in this Court, the United States government actually had to sue the Secretary because the office had failed and refused to comply with its obligations under HAVA. After fully considering the matter, Judge Watkins found it necessary and appropriate to enter an injunction and a declaratory judgment against the Secretary to force the Secretary to comply with the law's requirements on compiling a statewide voter registration list. [Exh. "2" (composite exhibit) - ECF# 16 in *USA v. State of Alabama et al.*, 2:06-cv-392-WKW].

But the Court in that case soon found that its injunction and declaratory relief were not enough to get the Secretary to comply with the obligations concerning the statewide voter registration list.  After receiving information from the Special Master he had appointed to address the Secretary's recalcitrance with respect to the statewide voter registration list, that the Secretary "may have impeded the progress of the Special Master in bringing the State of Alabama into compliance with HAVA," Judge Watkins removed the Secretary from the process, ordered the Secretary to file a detailed and verified response to the Special Master's Report and advised that after the Report was filed, the Court would consider whether to hold the Secretary in contempt. [Exh. "2" (composite exhibit) - ECF# 74 in 06-cv-392-WKW].[1]

Just two years later, the Alabama Democratic Party had to sue the Secretary to get an updated second free copy of the statewide voter registration list, which the Secretary unilaterally

---

[1] Perhaps not coincidentally, the docket sheet in 06-cv-392-WKW reflects that the Secretary whose failure to meet the legal obligations under HAVA and who was being considered for a possible contempt citation was represented by the same lawyers representing the Defendant in the instant case. [Docket Sheet in 06-cv-392-WKW at 3-4].

had refused to provide. [Exh. "3" (composite exhibit) - Complaint in *Turnham v. Chapman*, CV-901037.00 in Montgomery County Circuit Court].

At a press conference held in advance of filing the lawsuit, the Chair of the Alabama Democratic Party characterized his Party's need to get an updated statewide voter registration list in order to contact new voters prior to election day a "political emergency." [Exh. "3" (composite exhibit)].  The case was resolved with a consent judgment requiring the Secretary to provide the updated list. [*Id*.].

The Defendant also provides a free copy of the list to members of the legislature "to facilitat[e] communication between Members of the Alabama Legislature and the constituents whom they have been elected to represent." [ECF# 28-2 at 144].  The Defendant also provides the list to other parties in litigation, when he deems it to have been properly demanded. [ECF# 28-2 at 144].[2]

The Secretary acknowledges having provided a free statewide voter registration list to the plaintiffs in *Birmingham Ministries v. Secretary of State Merrill*, 2:15-cv-02193-LSC (N.D. Ala.)(Photo ID challenge) and to the plaintiff in a case litigated before Your Honor, *Thompson v. Secretary of State Merrill*, 2-16-cv-783-ECM-SMD. [ECF# 28-2 at 148].

Perhaps most significantly, notwithstanding his claims of hardship or burden in having to

---

[2]  The Defendant's assertion that it produces the list for free in litigation in "complying with its responsibilities as a litigant in State or federal court" [ECF# 28-2 at 144], is curious at best.  In this action, for which the statewide voter registration list and what it provides is at the heart of the case, the Defendant refused to produce the list in discovery, asserting that "[T]he statewide registration list is 'not relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1)." [Exh. "1" - Defendant's Responses and Objections to Plaintiff's First Requests for Production].

produce the statewide voter registration list for free to Alabama's own minor political parties [ECF# 5-1 at ¶¶33-34], the Defendant has now acknowledged that he joined the Electronic Registration Information Center, Inc "ERIC" in October of 2015.  Since then the Defendant has provided and continues to provide a free copy of a "data file containing the statewide voter registration list to ERIC **on a monthly basis** ...." [ECF# 28-2 at 149](Emphasis added).[3]

### The Statewide Voter Registration List is Vitally Important to a Political Party Seeking Ballot Access and the Election of Its Candidates.

In response to the assertions in the Complaint in this case that the voter registration list is important and valuable to a political party in Alabama seeking ballot access and seeking votes for its candidates in a primary or general election, [ECF# 1 at ¶¶8-9], the Defendant disingenuously claims he does not have sufficient information to admit or deny these assertions and so he has denied them. [ECF# 12 at ¶¶].

Really?  The chief election officer in Alabama knows the information on the voter registration list is directly relevant to both ballot access and campaigning efforts, he knows that his office gets a request from the Alabama Democratic and Republican parties every year for the statewide voter registration list, his office was sued by the Alabama Democratic Party for an additional, updated copy of the list, the need for which the Party referred to as an "emergency," and the Defendant provides two copies of the list free of charge each year exclusively to those two political parties and five free copies exclusively to them in statewide election years [ECF# 5-1 at ¶27]; but he does not know whether the list is valuable or important to a political party

---

[3]  Also in 2015, the Defendant agreed to provide Alabama's statewide voter registration list to other states' Secretary of State's offices through a Memorandum of Understanding for Interstate Voter Registration Data Comparison into which the Defendant entered. [ECF# 28-2 at 149].

seeking ballot access or votes in an election?  That is tough to believe, with all due respect.  It also is hard to reconcile with the good faith requirement of Rule 8(b) of the Federal Rules of Civil Procedure.

It is indisputable that the voter registration list in Alabama the voter registration list is very valuable to a political party.  Having the list gives a political party a distinct advantage in seeking to gain ballot access and get votes, along with other major benefits.  This undeniable fact is supported by the case law cited below, by political researchers, by the testimony of the witnesses the Defendant deposed and by experienced fact witness William Redpath [Exh. 5] and expert witness Richard Winger [Exh. 6].  The following are just some of the ways the list is important, especially to a minor political party seeking ballot access, seeking to grow and bring its message to a larger audience of Alabama citizens, and seeking to get candidates, voters, and to win elections - the goals of this Plaintiff:

A.  The voter registration list allows a political party to know the number of voters in a political voting location so as to know what voting locations the political party might want to prioritize in its efforts to gain support among the electorate.

B.  The voter registration list allows a political party, among other advantages, to reach out directly to registered voters by name and at their home, to solicit their support at the ballot box and with the party's platform, to communicate political speech directly to voters to whom the political speech on specific political issues might most directly apply and to introduce specific voters to prospective or active candidates most relevant to such voters.

C.  The voter registration list is vitally important to a party's ability to grow and disseminate its political message and to seek out and have its members associate with politically

like-minded voters in order to solicit and obtain ballot access signatures and to win elections for party candidates.

The voter registration list and the information contained on the list is very valuable to a political party seeking access to the ballot and seeking votes in a primary or general election in Alabama and gives a significant advantage in these areas to a political party that has a copy of the voter registration list and a political party which does not have copy of the voter registration list is placed at a distinct disadvantage in its efforts to gain ballot access and to solicit and win votes. [ECF# 1; Exhs. 5 & 6 hereto]

In *Fusaro v. Cogan*, 980 F.3d 241, 251 (4th Cir. 2019), the Court recently reaffirmed that a voter registration list is a "valuable tool for political speech." With respect to a voter registration list, the Court expressly recognized "the common use of such voter data by political groups, advocacy organizations, and others seeking to spread messages or garner support for candidates or causes." *See also, e.g., Green Party of N.Y. v. N.Y. State Bd. of Elections,* 389 F.3d 411, 420 (2d Cir. 2004) (recognizing that political parties use voter registration lists for "activities essential to their exercise of First Amendment rights")[4]; *Baer v. Meyer*, 728 F.2d 471, 475 (10th Cir. 1984)(access to information about political party affiliation is the key to successful political organization and campaigning).

---

[4] The Court in *Green Party* also reaffirmed the continued vitality of the landmark decision on which this challenge to Alabama's discriminatory scheme is based. The Court wrote, "[I]n *Schulz* we struck down a New York state law that required local boards of election automatically to supply two copies of enrollment lists, free of charge, to the county chairmen of Parties, but allowed the boards to charge independent bodies for access to such lists stating, "'it is clear that the effect of these provisions . . . is to deny independent or minority parties . . . an equal opportunity to win the votes of the electorate.'" 44 F.3d at 60 (quoting *Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 995 (S.D.N.Y. 1970). *See Green Party of N.Y. v. N.Y. State Bd. of Elections,* 389 F.3d 411, 420 (2d Cir. 2004).

"Perhaps the most widespread use of the voter files is to help political practitioners more effectively and efficiently engage with potential voters. Political campaigns make use of the files to identify potential supporters and to communicate with them, either to influence their candidate choice, mobilize them to turn out to vote, or both. Groups organized around specific issues such as gun rights or access to abortion use the files in similar ways."

https://www.pewresearch.org/methods/2018/02/15/voter-files-in-action/

The following are some examples from the record of ways in which some LPA officers and candidates the Defendant chose to depose believe the voter registrations lists to be vitally important in the ballot access petitioning process, the educating and advocacy process, and for campaigning and getting votes:  *See e.g.*, **[ECF# 28-19 - Deposition of LPA Chair, Laura Lane** - at 84-85 (used a voter registration list to validate signatures; at 92-93 -would use a voter registration list for dividing up voters to contact and walk the precinct, use it for mailing like the Democrats and Republicans do, send out educational materials to voters on the list, at 94-95 - use the voter list to go door to door; use it for ballot access, campaigning, and educating voters, at 96 - will probably get it for the presidential campaign, at 97-98 - need the statewide list to have a better chance of reaching out to field candidates][5];

**[ECF# 28-16 - Matt Shelby Deposition -** at 23-25 - Party explained to him that the voter registration list is very important to have in terms of petitioning for ballot access signatures; list provides a good guide for targeting registered voters for ballot access signature petitions; at 33 -

---

[5]  Ms. Lane also gave examples of the close ties between the national Libertarian Party and the LPA and ways in which they coordinate. [ECF#28-19 at 88 - LPA putting together a team to work toward getting the Libertarian Party presidential candidate support in Alabama; at 89 - LPA will likely put together money for the Libertarian presidential candidate's campaign in Alabama; at 100 - national Libertarian Party handles the LPA's website mostly].

14

used the list to check signatures; at 36 - used the list when canvassing to identify homes with registered voters and skip homes without registered voters; without the list likely would have cost him a lot more time and would have ended up with 100 invalid signatures; at 37; 57 - with the information already provided on the voter list, he could get prospective voters to talk more easily; at 53 - would have liked to have had an updated voter registration list for Baldwin County because of its dynamic growth, but it was too expensive for him to buy; 55-56 - main things he used the list he had for was door-to-door canvassing and mailings];

[ECF# 28-15 - Frank Dillman Deposition - at 32-33- - used voter list most productively to knock on doors; at 34 - would have liked to have had a voter list for whole area of the office he was seeking, but he could not afford it; at 38 - used the list for campaigning over the phone; at 46-47 - used the list to know which houses to go to and which to filter out; at 53; 76 - he had to buy the list to get it; at 58 - he would have liked to have had a list for 2018 campaign; at 59-60 - list would be most important to him for current campaign];

[ECF# 28-14 - Michael E. Reeves Deposition- at 25-26 - tried to use list to focus on going door to door for ballot access signatures, targeting only registered voters, but only list he had was old and not so useful and he could not afford a new list; 27- list is very important to held ensure signatures for petition are from valid registered voters; at 43 - would consider using the list for mailers; at 48 - he could not afford to buy an updated list];

[ECF# 28-18 - Doug Ward Deposition - at 48 - getting ballot access petition signatures without a voter registration list is almost impossible; at 51 - having a voter registration list helps cut down time dramatically going door to door for signatures; at 52 - the registration list helps make sure signature is written in same manner as registration to avoid having signatures invalidated; at

56-57 - having the list would be a great help in validating signatures; at 58 - data provided by the list is everything; at 59 - with the information from the list he could have gotten more volunteers and more resources in a shorter period of time; at 61 - he could not afford the list; at 73-74 - when he finally got a list, he was able to see the error in signatures he had obtained that were rejected because they did not match the name exactly as it appeared on the list;[6] at 85 - he considered buying a list from Nationbuilder for less money than the Defendant charges (and ended up getting one), but found out Nationsbuilder lists were outdated; at 93-94 - once ballot access is achieved, the registration list is very important for campaigning; at 97 - the list is important for going door to door and sending personalized mailings to registered voters];

**[ECF# 28-17 - Elijah Boyd Deposition** - at 29; 42 - used the voter registration list to contest invalidated signatures; 35-36 - used voter registration list when gathering ballot access signatures to find the streets registered voters lived on; at 59 - with the list the petitioning process goes more smoothly because he can target voters' houses and address them by name].

**The Defendant's Argument that the Voter Registration List is Merely a "Government Record that Does Not Implicate Election of Ballot Access Issues is Simply Wrong.**

In light of the previous section's focus on the use and importance of the voter registration list in the election process, it is appropriate to address here one particular argument the Defendant has made.

The Defendant argues in his Memorandum that the voter registration list and the statutes

---

[6] Mr. Ward's ballot access petition was rejected by the Defendant as just barely short of the number of valid signatures he needed [ECF# 28-18 at 71]. When he finally was able to buy a registration list he had to pay $80 just to get to see which signatures on the petition he had turned in the Defendant had considered invalid, so he could then match them with the registration list [ECF# 28-18 at 73-75; 76].

regulating them do not actually even relate to ballot access, elections, or other core political activity; rather it is just a matter of whether a "government record" needs to be disseminated. [ECF# 30 at 18-19].  The argument is absolutely wrong for many reasons as the Defendant well knows from the Complaint and from all previous filings in this case; indeed, it does not even appear to be a defense raised in the Defendant's Answer [ECF# 12].

Most significantly, the Defendant simply ignores the entire body of voter registration list authority once again, all of which completely eviscerates this argument.  Perhaps even more curiously, the Defendant does not even mention the recent decision in *Fusaro v. Cogan*, 930 F.3d 241(4th Cir. 2019) which expressly considers and rejects this exact argument as to a voter registration list.  The omission of the *Fusaro* case is so surprising because the undersigned expressly brought it to the Defendant's attention two days after it was decided, by filing notice of the recent relevant authority [ECF# 9].

In *Fusaro*, the Plaintiff, a non-resident of Maryland, who admittedly had no plans to live in or register to vote in Maryland, brought a First Amendment challenge to a Maryland statute that limited the distribution of Maryland's voter registration list exclusively to registered Maryland voters and that prohibited the use of its voter registration list for any purpose "not related to the electoral process." *Id*. at 247.

The district court dismissed the Complaint and the Fourth Circuit reversed and remanded the dismissal on First Amendment grounds, finding that the claims were due to be considered on their merits under the *Anderson-Burdick* analytical test. *Id*. at 258, *citing Libertarian Party of Ind. v. Marion Cty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1459-63 (S.D. Ind. 1991)(applying *Anderson* to Indiana law that provides copies of voter registration list only to

Republican and Democratic parties and not to minor parties).  *See also*, *Id*. at 264.

The Fourth Circuit expressly considered the exact argument Defendant makes here -that what was at issue was merely a "government record" - and rejected it based on the clear entanglement with political speech, election activity and speaker-based regulations concerning access to the list.  *Id*. at 252-262.  Indeed, this is the exact issue on which the district court was reversed, *Id*. at 248 and, contrary to Defendant's argument, the Court in *Fusaro* expressly referred to the regulation of access to the voter registration list as an "electoral regulation" and noted that a voter registration list is designed to facilitate canvassing and outreach.  *Id*. at 251

The reasoning in *Fusaro* applies with even greater force and the burden here is even greater, based here on the discrimination between Alabama major and minor parties to this list which is directly related to Alabama elections, to ballot access in Alabama, to the ability of a minor party to grow and do all a political party does - all with respect to a list generated at Alabama taxpayer's expense.

Additional portions of the decision in *Fusaro* are directly relevant here as well:

1.  The case discusses the valuable link between voter lists, political speech, and the First Amendment.  *Id*. at 250-251; 255-256..

2.  The case specifically notes the importance of voter lists to political parties and candidates.  *Id*. at 251, *citing Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004).

3.  The case also discusses the constitutional problems with distinguishing between minor parties and major parties with respect to voter lists, when an "unequal burden" is placed on the former. *Fusaro*, *Id*. at 261.

18

4.  Perhaps most directly relevant to the instant case, the Court in *Fusaro*, *Id*. at 256, n.8, wrote:

> Nearly fifty years ago, the Supreme Court expressed support for constitutional limits on the government's ability to restrict access to voter registration lists in a summary affirmance of an Equal Protection claim. *See Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984 (S.D.N.Y.), *judgment aff'd*, 400 U.S. 806 (1970). In that case, a three-judge district court panel struck a New York regulation that provided free copies of the state's voter list only to major political parties. The court ruled that the restriction violated the Equal Protection Clause and explained: **"The State is not required to provide such lists free of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them."** Id. at 996. (Emphasis added).[7]

 **The Libertarian Party**:

Defendant appears to argue in its Memorandum, in misguided reliance on its "expert," that the Libertarian Party is something other than a real minor political party and therefore discriminating against the LPA with respect to the voter registration list should not really be a concern. [ECF# 30 at 7-12].  The argument is wrong, offensive, and requires no belabored response. Again, this position is found nowhere in the Defendant's Answer [ECF# 12].

In fact, the Defendant admits, as it must, the unique success the LPA has had in achieving

---

[7]  The next argument in the same section of the Defendant's Memorandum - that the LPA should be satisfied with smaller portions of the voter registration list that a Party so situated can afford and does not need the statewide list provided free to the major parties [ECF# 30 at 19] need not be dignified with a response.  It cuts against a century or more of First and Fourteenth Amendment jurisprudence, quoted from herein, on the fundamental rights of citizens to fully support new parties with new ideas and for parties to be able to bring their message to and get support from all voters across the state.  Following the Defendant's argument to its logical conclusion, and given the primacy of the voter registration list in the ballot access, education, and campaigning process as developed in the record and reflected in the cases, the Defendant would effectively put off limits to the LPA statewide offices.  This is particularly ironic in light of the unique accomplishment of this Plaintiff in not only qualifying for statewide ballot access as a result of its showing in 2000, but in getting over 20% of the vote for the statewide office at issue in that election.

statewide access in 2000 and putting candidates on the ballot following that achievement. [ECF#
12 at ¶3].  That alone establishes its bona fides as a vibrant minor party.  But it need not defend
itself on this absurd and instead directs the Court to the submissions accompany this Response
provided by Messrs. Redpath and Winger [Exhs. 5&6], portions of which (from Mr. Winger) are
excerpted here:

**Excerpt from Richard Winger Declaration [Exh. 6]:**

The Alabama Libertarian Party has been continuously organized since 1976.  By that I
mean it has always had party officers, has always sent a delegation to the national Libertarian
convention (the party has national conventions in all even years), has had a webpage since
webpages became widespread.

In addition to appearing on the Alabama ballot by party name, the LPA also has
nominated write-in candidates.  In 2006, for example, it nominated Loretta Nall for Governor.
She was credited by the state with 235 write-in votes.  The true total was probably higher, but not
all counties broke down all the write-ins.  Also in 2006 it had a write-in candidate for US House,
District One, Dick Coffee.  Also in 2006 it had a candidate for State House, 79th district, on the
ballot, Dick Clark, who got 396 votes, 3.12%.  In 2004, the party ran Richard Coffee as a write-in
for US House, 1st District.  In 2014 the party had 5 write-in candidates for state legislature.  St
Sen 18 Laura Pate; St Sen 20 Leigh LaChine; Rep 44 Rebecca Joy Kallies; Rep 48 Emily Green;
Rep 52 Christopher Allen.  Also in 2014 it had a write-in US House candidate, Dist. 6, Aimee
Love.  In 2018 the party got two candidates on the ballot for legislature, Rep 10 Elijah Boyd; Rep
96 J. Matthew Shelby.  They both got over 5%.  So, including President, the party has nominated
candidates in every single election year in this century except 2010.

Among other national accomplishments, Libertarian Presidential candidates in recent years have received a significant amount of votes nationally.  Compare, e.g., Libertarian Ed Clark in 1980 got over 1% of the popular vote at 921,128 votes and then Libertarian Gary Johnson got 1,275,923 votes in 2012, and 4,489,233 votes (3.27%) in 2016.

In the year 2000, the Libertarian Party of Alabama made a strong showing in terms of ballot access and, in one particular statewide race, in terms of votes (over 20%).

Over the past decade Libertarians got over 20% of the vote for statewide office in races in Arkansas, Georgia, and Texas.  And, of course, as mentioned, the LPA did so in a 2000 race.

The Libertarian Party has over 600,000 registered voters in the nation (and only 31 states have registration by party; Alabama does not).  Also the Libertarian Party has elected partisan office-holders in about half the states.  Notably, the Libertarian Party has elected state legislators in Alaska, New Hampshire, and Vermont, and has had sitting state legislators (who switched to the Libertarian Party after they were elected) in Nebraska and Nevada.  The Libertarian Party has polled over 1,000,000 votes for its US House candidates in most congressional elections in this century.  It is the only third party that has run candidates for US House in a majority of districts, since 1918.

At its national convention the Libertarian Party has delegates participating from all 50 states, including 13 from Alabama for 2016, who attended the convention in Orlando, Florida. The LPA also chooses a national committee representative.

The relationship between the national Libertarian Party and the Alabama Libertarian Party is the same kind of relationship as between the national Republican Party and the Alabama Republican Party, or between the Alabama Democratic Party and the national Democratic Party.

21

Votes for the Libertarian Party candidate for President of the United States (appearing on Alabama's ballot as an Independent, because of Alabama's prohibitively onerous ballot access requirements to appear under a third-party label) appear to be rising:  2000:  5,893 votes; 2004:  3,512 votes; 2008:  4,991 votes ; 2012:  12,328 votes; 2016:  44,467 votes.

Plaintiff would refer the Court to Mr. Redpath's declaration, offered as from a fact witness based on his personal, long-time association with the Libertarian Party. [Exh. 5]

Finally, on this point, the following information linked to online sites further advances the point:

The LPA's by-laws, easily accessed through the LPA's website,

https://lpalabama.org/about/bylaws/.

Clicking on the bottom right hand corner of the main LPA website page for "Platform," takes one directly to the Platform.  There is also a direct link to the National Party.

https://lpalabama.org/.  Once on the National Party page, in the news section, one will find items published by LPA members, including its Chair, Ms. Lane.

https://www.lp.org/category/news/page/2/.  On the National Party page, the delegates to the national convention (including Alabama's 13 delegates and 50 alternates) is reflected.

https://www.lp.org/2020-lnc-convention-delegation-allocation/  One can do a search at the top of the National website for "Alabama" and find all kinds of articles, etc.

Finally, the Libertarian Party has fielded a candidate for President in every Presidential election since 1976 and, of course, in the most recent Presidential election, the Libertarian Party candidate, Gary Johnson (former New Mexico Governor) and his running mate, William Weld (former Massachusetts Governor) were on the ballot in all 50 states and received almost 4.5

million votes, including over 44,000 in Alabama.  His Libertarian Party candidacy was a major

national phenomenon.

https://www.newyorker.com/magazine/2016/07/25/gary-johnson-the-third-party-candidate.

https://en.wikipedia.org/wiki/Gary_Johnson_2016_presidential_campaign#cite_note-139

See also, LNC2020.com.  Plaintiff does not concede that it would have to meet Defendant's

definition of a political party to demonstrate the First and Fourteenth Amendment violations

alleged here - other, non-party political groups[8], for example might well have similar

constitutional claims to successfully bring; but in any event, the LPA more than satisfies any

legitimate definition of a minor political party (or "third-party"), as that term is used in the

relevant jurisprudence.

## LEGAL FRAMEWORK AND ANALYSIS

## STANDARD OF REVIEW

      This Court has described the standard for the consideration of a motion for summary

judgment as follows:

> "Summary judgment is proper if the evidence shows 'that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment as a
> matter of law.'" *HornsbyCulpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018)
> (quoting FED.R.CIV.P. 56(a)). "[A] court generally must view all evidence and
> make all reasonable inferences in favor of the party opposing summary judgment."
> *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir.
> 2016). However, "conclusory allegations without specific supporting facts have no
> probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924-25 (11th Cir.
> 2018). If the record, taken as a whole, "could not lead a rational trier of fact to
> find for the non-moving party," then there is no genuine dispute as to any material
> fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

---

[8]  *See e.g. Williams v. Rhodes*, 393 U.S. 23, 39 (1968)(Douglas, J. concurring).

> The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311-12.

*Smith v. Glasscock*, 2020 U.S. Dist. LEXIS 81424, *2 (M.D. Ala., May 8, 2020)(Marks, C.J.).

Under Rule 56(f)(1), based on the record now before the Court, summary judgment is due to be granted in favor of the Plaintiff as a matter of law.

**SUBSTANTIVE LEGAL ANALYSIS ON THE MERITS**:

**The Voter Registration List Cases are Dispositive and Require Judgment for the Plaintiff.**

The best and most directly relevant place to look to analyze the substantive issue before the Court - whether the statutes at issue and the Defendant's practice under them in discriminating against minor political parties with respect to the voter registration list violate the Plaintiff's First and Fourteenth Amendment rights under the Constitution - is to the abundant, consistent well settled authority decided directly on point for the past 50 years.  Indeed, the analysis in this case should start and stop there; for all such authority makes it crystal clear that the Plaintiff must prevail in this case as a matter of law.  The Defendant has worked desperately to divert the Court's attention from these simple, direct, compelling, and dispositive decisions by raising all sorts of specious arguments. They must all be rejected.  The following demonstrates the point:

The leading case which makes clear that the Alabama statutes and the Defendant's practice complained of herein violate Plaintiff's constitutional rights is, of course, *Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 997 (S.D.N.Y.)(three-judge court), *summarily*

24

*affirmed*, 400 U.S. 806 (1970).  *See also, Schultz v. Williams*, 44 F.3d 48, 60 (2d Cir. 1994).  In these cases, the courts expressly held that a New York law which provided for free copies of the voter registration list for the major political parties and charged the minor parties violated the Equal Protection, even though the State also made copies available for viewing at polling places free of charge. 314 F. Supp. At 995. These courts made clear in no uncertain terms that while a State is not required to provide free lists to anyone, when it provides it free of charge to some, it cannot do so by providing them "only for the large political parties and deny(ing) them to those parties which can least afford to purchase them." 314 F. Supp. At 996.

The analysis in these cases is compelling and makes clear the folly of Defendant's position to the contrary almost fifty years later.

In *McCarthy v. Kopel*, No. C 76-45 (N.D. Iowa, February 6, (1978) (unpublished) [ECF# 7-1], Plaintiffs were independent candidates for president and vice-president, seeking Iowa's voter registration lists. The relevant statute in Iowa provided that the two parties receiving the highest number of votes in the last general election got free copies of the voter registration list, while all others had to pay for the list.  Plaintiffs sought a declaratory judgment that this discrimination in favor of major parties with respect to the voter registration lists violates the Equal Protection Clause of the Fourteenth Amendment and a permanent injunction prohibiting enforcement of the statute that so provided.  The Court granted Plaintiffs' summary judgment motion, declared the statute to be void for its violation of the Equal Protection Clause, and permanently enjoined its enforcement.

The Court noted at the outset of its analysis that without question the distinction between providing the voter registration list free of charge to major parties while charging minor parties

and non-party candidates, discriminates against minor party and non-party candidates. *Id.*, at 3.

It posited the question as whether the purported state interests claimed to support the statute were "sufficiently important" to "warrant the obvious burden" or whether the statute "unfairly and unnecessarily burdens the political opportunity of a non-party candidate." *Id*.

The Court declined to decide whether strict scrutiny/compelling interests analysis or a slightly less stringent standard should apply to this circumstance (finding the circumstances presented to be somewhere between campaign financing cases and ballot access cases); but it noted that "when the state moves to regulate the electoral process which is inextricably linked to fundamental constitutional rights, its purposes must be important and its methods narrowly tailored to fostering those interests." *Id.* at 6.  It also required the use of least restrictive means to further any proffered state interest and found that missing in such a statutory scheme as well. *Id.* at 7.

The Court ultimately found that a statute which discriminates in favor of major parties and against minor parties and independents with respect to the cost of voter registration lists, unconstitutionally favored the two party system and a "rigid status quo[9]" and created an "unfair burden" on those who try to use a political system that is meant to foster their interests in articulating "political choice." *Id*.  It struck down the Iowa statute as violation of the Equal Protection Clause. *Id*. at 7-8.

In *Libertarian Party of Oregon v. Paulus*, Civil No. 82-521FR (D. Oregon, September 3,

---

[9]  This principle, as articulated in this case and many more, of course shreds the notion asserted by this Defendant that there is a legitimate state interest in "subsidizing" the status quo, effectively cementing the monopoly the Democrats and Republicans have. [See ECF# 30 at 35].

1982) (unpublished)[Relevant Excerpts at ECF# 7-2][10], the court again considered a state statute that discriminated between major and minor parties with respect to its voter registration lists, providing them for free to the major parties and at a charge to the minor parties.

The court's analysis speaks for itself and is fully consistent with the cases previously described herein.  Additionally, the court in this case expressly rejected the purported "administrative interest" the Defendant herein speculates might arise if, in his straw man argument, the list were to be provided free of charge to anyone.  *See Paulus*, at Page 17.[11]  The court in *Paulus* struck down this same kind of discrimination with the voter registration lists as unconstitutional.

In *Libertarian Party of Indiana v. Marion County Bd. of Voter Registration*, 778 F. Supp. 1458 (S.D. Ind. 1991), the court again was confronted with a similarly discriminatory scheme with respect to voter registration lists and again struck the same down as unconstitutional.

––––––––––––––––––––

[10]  Much of the lengthy unpublished decision has nothing to do with the specific issue before this Court; so only relevant excerpts have been attached; however, the undersigned has a hard copy of the entire decision and can provide it to the Court, of course, if the Court so directs.

[11]  The sole purported state interest Defendant claimed initially in this case to attempt to justify the burden on Plaintiff's fundamental constitutional rights is the purely speculative "administrative interest" in possibly being overburdened with requests if anyone gets the list for free. [ECF# 5-1 at ¶¶33-35]. Of course, as noted, Plaintiff is a well established political party in Alabama that has gotten ballot access in many instances in the State in a variety of election contests and is not claiming every requestor must get a list for free - that might be fair; but it is beyond this case.  As alleged in the Complaint, if a representative from all other 49 states requested a free copy of the voter registration list and agreed to provide their own list in return, the Defendant would have to satisfy every one of the 49 requests. [Doc. 1 at ¶18] Surely, Defendant is not asserting that there are 50 parties that hold the status of this Plaintiff in Alabama.  And of course, even if there were, there has been no showing either that all would request the list or that sending an email to 50 or more recipients is a full-time overly burdensome task.  Defendant certainly has made no such showing. In his motion for summary judgment, Defendant has somehow discovered additional purported state interests to justify the discrimination.  They are all at least as equally unavailing and will be addressed.

In this case, the court expressly used the analytical framework for ballot access cases developed in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

The court noted the unconstitutional effect such discrimination with voter registration lists has on a Party's ability to seek equal access to voters, giving a significant and unwarranted advantage to major political parties in this regard. *Id*. at 1463. This, in turn "... impinges not only upon the members' freedom to associate as a party but also upon an individual voter's ability to assert her preferences." *Id*. The court went on to consider other severe burdens such discrimination places on those situated like this Plaintiff.

The court suggested that perhaps a "stricter standard of review" than that used in *Anderson* should be used to deal with voter registration list discrimination of this kind specifically because it is by definition discriminatory by favoring the larger parties, but ultimately, it found it unnecessary to answer that question because the discrimination was clearly unconstitutional even under the *Anderson* ("important" state interests level of scrutiny). *Id*

In considering the same kind of discriminatory scheme at issue in Alabama in the instant case, the court wrote the following:

> The plaintiffs in this case seek equal access to voters, meaning that significant advantages may not be accorded to two major political parties and arbitrarily denied to others. Restricting a political party's ability to reach voters impinges upon not only the members' freedom to associate as a party but also upon an individual voter's ability to assert her preferences. In the context of a case involving restrictions on access to the ballot, the Supreme Court ruled:
>
> The freedom to associate as a political party, a right we have recognized as fundamental, has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because absent recourse to referendums, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). By limiting the choices available to voters, the State. impairs the voters' ability to express their political preferences." *Illinois State Bd. of*

*Elections*, 440 U.S. at 184, 99 S.Ct. at 990. Like a restriction on access to the ballot, restrictions on the ability of some political parties to use Registration Lists impinges upon both the members' freedom to associate to express their views to the voters and the voters' ability to express preferences in light of the political views being advanced. Although the plaintiffs have access to the Registration List, their undisputed contention is that they would have to expend significant amounts of labor and money to have the list in a usable form, a burden not imposed on the major political parties.

In support of their position, the plaintiffs cite *Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984 (S.D.N.Y. 1970), *judgment aff'd*, 400 U.S. 806, 91 S.Ct. 65, 27 L. Ed. 2d 38 (1970). In *Socialist Workers Party*, the court examined provisions of a state statute that "provide[d] that lists of registered voters be delivered free of charge to the county chairmen of each political   party polling at least 50,000 votes for governor in the last gubernatorial election." *Id.*, 314 F. Supp. at 995. The court ruled: "The State has shown no compelling state interest nor even a justifiable purpose for granting what, in effect, is a significant subsidy only to those parties which have the least need therefor." *Id.* (citation omitted)....[12]

The court ordered the voter registration lists to be provided to the New Alliance Party and the Libertarian Party under the same terms as they were provided to the major parties, based on the Equal Protection violation it found to arise from the discrimination at issue.  *Id.* at 1464-1465.  *Libertarian Party of Indiana v. Marion County Bd. of Voter Registration*, 778 F. Supp. 1458, 1463-1464 (S.D. Ind. 1991); *See also Spencer v. Hardesty*, 571 F. Supp. 444 (S.D. Ohio 1983)(First Amendment rights violated by preferential treatment in postage rates for large political parties over local political action committee); *Greenberg v. Bolger*, 497 F. Supp. 756 (E.D.N.Y. 1980)(First Amendment and Equal Protection violation of minor political party's rights by giving preferential bulk mailing rates to major parties and not minor parties).

The decision in *Green Party v. Land*, 541 F. Supp. 2d 912 (E.D. Mich. 2008) is important

---

[12]  The court then considered and rejected the idea that the administrative burden of financial cost of distributing the voter registration lists to minor parties could outweigh the clear violation of the plaintiff's constitutional rights arising from providing the list for free to only the major political parties.  *Id.*

29

for several reasons, including, but not limited to, its emphasis that for these purposes "all political parties are similarly situated ...", *Id*. at 917, thereby squarely raising the Equal Protection concern, (2) its use of ballot access analysis, and (3) its comprehensive consideration of purported state interests far greater in number and significance than the single purported interest earlier proffered here and still listed as one of his fabricated interests.

Finally, the decision rests not only on traditional ballot access burden vs. interests analysis under *Anderson* and its progeny; it draws directly on the decisions in *Socialist Workers Party* and *Libertarian Party of Indiana* and their analysis specific to voter registration lists as well. *Id.* at 918-920.

The court found a clear Equal Protection violation, struck down the law at issue and found it therefore unnecessary to address the First Amendment arguments. *Id*. at 924.

Plaintiff also has provided the Court with rather bare bones decisions in two other cases in which the courts involved order that non-major party requesters be provided with voter registration lists after bringing challenges to similarly discriminatory laws; but, admittedly, the only documents from those cases obtained so far do not provide much in the way of analysis. *See Bloom v. EU*, No. 368805 (Cal. Superior Ct., unsigned order of December 4, 1991); *Goetzke v. Boyd*, Case No. 280289 (Ariz. Superior Ct., Pima Co., Order of July 22, 1991)[ECF# 7-3 & 7-4].

**An Additional Case with another Discriminatory Voter Registration List Scheme:**

Another case arising from somewhat similar state schemes also is helpful in their analysis.

In *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419-422 (2d Cir. 2004), the court considered a New York statute that provided for the removal of the political party

affiliation identifier on voter registration lists for any political party that did not receive a certain

level of support in the previous New York gubernatorial election.   The court wrote the following

in pertinent part:

> Plaintiffs also contend that the statutory classification scheme violates the Equal Protection Clause of the Fourteenth Amendment because the state's enrollment list policy gives established Parties an advantage over minor or developing parties. The Supreme Court has said that if state law grants "established parties a decided advantage over any new parties struggling for existence and thus place[s] substantially unequal burdens on both the right to vote and the right to associate" the Constitution has been violated, absent a showing of a compelling state interest. *Williams v. Rhodes*, 393 U.S. 23, 31, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968). Hence, a court has a duty to "examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183, 59 L. Ed. 2d 230, 99 S. Ct. 983 (1979). Where the state's classification "limit[s] the access of new parties" and inhibits this development, the state must prove that its classification is necessary to serve a compelling government interest. *See Norman v. Reed*, 502 U.S. 279, 288-89, 116 L. Ed. 2d 711, 112 S. Ct. 698 (1992); *Schulz*, 44 F.3d at 60. Even if a state is pursuing a compelling interest, it must show that the means it adopted to achieve that goal are the least restrictive means available. *Ill. State Bd. of Elections*, 440 U.S. at 185.
>
> The laws at issue in this case, according to plaintiffs, place discriminatory burdens on minor political parties. The alleged unequal burdens are those that affect claimants' ability to exercise their First Amendment rights. *See Anderson*, 460 U.S. at 793-94 ("A burden that falls unequally on new or small political parties . . . impinges, by its very nature, on associational choices protected by the First Amendment."). As the alleged violations of the plaintiffs' First Amendment rights form the basis of both the First Amendment and Fourteenth Amendment claims, we are faced with a situation where the plaintiffs' First Amendment claims substantially overlap with their equal protection claims. Accordingly, the analyses of plaintiffs' claims under the two amendments also substantially overlap.
>
> We think the burdens imposed on plaintiffs' associational rights are severe. In Schulz we struck down a New York state law that required local boards of election automatically to supply two copies of enrollment lists, free of charge, to the county chairmen of Parties, but allowed the boards to charge independent bodies for access to such lists stating, "'it is clear that the effect of these provisions . . . is to deny independent or minority parties . . . an equal opportunity to win the votes of the electorate.'" 44 F.3d at 60 (*quoting Socialist Workers Party v.*

*Rockefeller*, 314 F. Supp. 984, 995 (S.D.N.Y. 1970)). Similarly, while the enrollment lists at issue here may have originally been intended solely for use in facilitating closed primary elections, we are required to look at the totality of the voter enrollment scheme in its present form. Currently, Parties use these lists for a number of different activities essential to their exercise of First Amendment rights.

Based on the proof produced at the hearing on the preliminary injunction, the district court determined that "the Green Party's ability to identify, appeal to, inform, organize, mobilize and raise money from its supporters will be severely damaged" as a result of the current enrollment scheme. *Green Party I*, 267 F. Supp. 2d at 353. It ruled in this fashion based on Supreme Court and Second Circuit precedent. *See, e.g., Anderson*, 460 U.S. at 794 ("By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce the diversity and competition in the marketplace of ideas."); *Lerman*, 232 F.3d at 147-48 (noting that a "statute need not [ban association altogether] in order to substantially burden the right to political association" if it prevents a candidate from accessing voters or conveying a political message).

In a case similar to the one now before us, the Tenth Circuit ruled that in today's political landscape, "access to minimal information about political party affiliation is the key to successful political organization and campaigning." *Baer v. Meyer*, 728 F.2d 471, 475 (10th Cir. 1984). If an independent body does not have access to other information concerning who is affiliated with its party, it will be unable to determine from the word "unaffiliated" whether a particular unaffiliated voter is or is not a supporter of its organization. It burdens all the plaintiff parties if they cannot determine who would like to associate with them. That they are smaller, less developed -- and hence less financially established parties makes their situation even more difficult. As *Anderson* instructs, such limitation of opportunity for independent voters reduces diversity and competition in the marketplace of ideas. 460 U.S. at 794.

***Anderson/Burdick* Analysis:**

The First and Fourteenth Amendments afford all candidates vying for elected office, and their voting constituencies, the fundamental right to associate for political purposes and to participate in the electoral process and espouse their political views. *See, e.g., Clingman*, 544 U.S. at 586; *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson*, 460 U.S. at 787-88; *Williams*, 393 U.S. at 30; *Lee v. Keith*, 463 F.3d 763, 767-68 (7th Cir. 2006) (quoting *Clingman*

32

*v. Beaver*, 544 U.S. 581, 586 (2005). Placing restrictions on candidates' and political parties'

access to the ballot interferes with their right to associate for political purposes and the rights of

qualified voters to cast their votes for the candidates of their choice. *Munro v. Socialist Workers*

*Party*, 479 U.S. 189, 193 (1986) (*citing Williams*, 393 U.S. at 30); *see also Norman v. Reed*, 502

U.S. 279 (1992); *Anderson*, 460 U.S. at 786; *Ill. State Bd. of Elections v. Socialist Workers*

*Party*, 440 U.S.173, 184 (1979).

Ballot-access requirements that place more burdensome restrictions on certain types of

candidates than on others implicate rights under the Equal Protection Clause as well. *See*

*Williams*, 393 U.S. at 30-31; *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 695 (6th Cir.

2015) (finding that a ballot access restriction that "imposes a greater burden on minor parties

without a sufficient rationale put forth by the state . . . violates the Equal Protection Clause"); *see*

*also Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1980); *Lubin v. Panish*, 415 U.S. 709,

713-714 (1974); *See also, Libertarian Party of Ill. v. Ill. State Bd. of Elections*, 164 F. Supp. 3d

1023, 1029 (N.D. Ill. 2016), *affirmed by*, *Libertarian Party of Illinois v. Scholz*,  872 F.3d 518,

523-24 (7th Cir. 2017)*(*discussing Equal Protection principles applied to restrictions which

discriminate against minor parties in favor of major parties).

In striking down Ohio's ballot access in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the

Court set out the requisite analytical framework as follows:

> Constitutional challenges to specific provisions of a State's election laws therefore
> cannot be resolved by any 'litmus-paper test' that will separate valid from invalid
> restrictions.  Instead, a court must resolve such a challenge by an analytical
> process that parallels its work in ordinary litigation.  It must first consider the
> character and magnitude of the asserted injury to the rights protected by the First
> and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must
> identify and evaluate the precise interests put forward by the State as justifications

for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.  460 U.S. at 789. (Internal citation omitted.)

The Court in *Anderson* rejected the use of any "'litmus-paper'" to "separate valid from invalid [ballot access] restrictions."  460 U.S. at 789.  Instead, a court determining whether a challenged ballot access restriction is unconstitutional must:  1) evaluate the character and magnitude of rights protected by the First and Fourteenth Amendments; 2) identify the State's interests advanced as justifications for the burdens imposed by the ballot access restrictions; and 3) evaluate the legitimacy and strength of each asserted state interest, and determine whether and to what extent those interests required burdening the plaintiffs' rights.  *Id*.  *Bergland v. Harris*, 767 F.2d 1551 1553-54 (11th Cir. 1985); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1355-56, 1366-67 (N.D. Ga. 2016), *affirmed by and Opinion adopted in whole by Green Party of Georgia*, 2017 U.S. App. LEXIS 1769 (11th Cir., February 1, 2017), *rehearing and rehearing en banc denied* (11th Cir., March 31, 2017)(requiring the Secretary of State to prove the strength, legitimacy, and applicability of its claimed interests, consistent with long-standing precedent; reaffirming that a "litmus-test" approach is prohibited);*Green Party of Ga. v. Georgia*, 551 Fed. Appx. 982 (11th Cir. Ga. 2014)(Same).

In order to permit the required evaluation of competing interests, "[t]he State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access."  *Id. Bergland*, 767 F.2d at 1554.  *See also*, *Mandel v. Bradley*, 432 U.S. 173, 178 (1977)(Court must sift through conflicting evidence and make findings of fact

34

as to the difficulty of obtaining signatures in time to meet the deadline); *Storer v. Brown*, 415 U.S. 724 (1974)(a court is required to examine the facts and circumstances of each case individually and may not apply a "litmus test").

In analyzing a particular burden to First and Fourteenth Amendment rights in the ballot access context, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi,* 504 U.S. 428, 434 (1992). Regulations imposing severe burdens on associational rights must be narrowly tailored to advance a compelling government interest. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). Regulations imposing lesser burdens are subject to less intensive scrutiny, and reasonable, nondiscriminatory restrictions ordinarily will be sustained if they serve important regulatory interests. *Ibid.*

Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions."  *Clingman*, 544 U.S. at 603 (O'Connor, concurring); *See also*, *Clingman*, 544 U.S. at 596-87 ("Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest).

"[W]hat is demanded (by the State) may not be so excessive or impractical as to be in

reality a mere device to always, or almost always, exclude parties with significant support from the ballot.  The Constitution requires that access to the electorate be real, not 'merely theoretical.'"  *Party of Texas v. White,* 415, U.S. 767, 783, 94S. Ct. 1296 (1974).

In this analysis, "the burden is on the state to 'put forward' the 'precise interests ... [that are] justifications for the burden imposed by its rule,'" and to "explain the relationship between these interests" and the challenged provision. *Fulani*, 973 F.2d at 1544 (*quoting Anderson*, 460 U.S. at 789). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." *Bergland*, 767 F.2d at 1554.

Courts are to determine the appropriate level of scrutiny based on the seriousness of the burden imposed. "Regulations imposing severe burdens ... must be narrowly tailored and advance a compelling state interest," while "[l]esser burdens ... trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-59 (1997) (citations and internal quotation marks omitted)

As discussed earlier, courts have applied the *Anderson/Burdick* framework to voter registration list discrimination schemes.

**Severe Burden**

Plaintiff here contends that the discrimination at issue in this case constitutes a severe burden on its First and Fourteenth Amendment rights.  That is, it severely burdens both the Plaintiff's associational and other First Amendment rights and the Plaintiff's rights under the Equal Protection Clause vis a vis the major parties.

First, the statute and the Defendant's practice clearly discriminate against minor parties

like the Plaintiff, in favor of major parties by definition, therefore taking it outside the realm of

"nondiscriminatory" regulations that might just

justify less stringent scrutiny. *See e.g., Timmons*, at 358, referring to "nondiscriminatory"

regulations as deserving of lower level scrutiny.

Secondly, the discriminatory regulations impose a severe burden on the ability of the

Plaintiff and other minor parties to obtain ballot access signatures, educate voters as to the

Party's political views and platform, campaign effectively, and all of the factors discussed

hereinabove as a result of not having the voter registration list for free - on the same terms as the

major parties get it. The burden is both in a vacuum and in relation to the ability of the major

parties to engage in these and other politically related associational activities.

The Court does not need to find a severe burden in order to strike down the

discriminatory regulations, for as other courts have correctly found, under any standard, there is

no constitutionally cognizable rational basis for this discriminatory practice.

**The State's Claimed Interests are Completely Unavailing**.

At Pages 27-40 of his Memorandum, the Defendant sets out what he now claims are the

State's interests justifying the discrimination at issue. Plaintiff need not significantly burden the

Court's time with a lengthy discussion of the State's newly discovered interests it now claims

justify this discrimination.[13]

---

[13] Interestingly, when the Defendant filed his earlier motion to dismiss, it was accompanied by a Declaration from, Clay Helms, the man in the office in charge of these matters, that purported to explain the purported state interest justifying the discrimination challenged here. [ECF# 5-1] He was only able to identify a single state interest that purportedly justified unlawfully discriminating against minor parties charging them an exorbitant fee for a computerized copy of the statewide voter registration list compiled at taxpayers' expense. That single purported state interest was that providing smaller political parties like the Libertarian Party of Alabama with a

First of all, the Defendant never explains the source from which he has concluded the state interests he now claims justifies the discrimination arises.  He offers nothing but his invention of them.

Any claim of hardship or undue burden, of course, is dramatically undercut by this admission that the Defendant already provides a free statewide voter registration list each and every month to ERIC. [ECF# 28-2 at 149]  It is further undercut by the Defendant's additional admission in response to Plaintiff's interrogatory on the subject that once the list has been compiled and provided free of charge to the other people and groups to whom/which the Defendant already provides it, the only extra time required to provide the same list free of charge to the Plaintiff would be the amount of time required to send an email. [ECF# 28-2 at 124]  Moreover, even in his dreamt up worst case scenario, that other minor parties will come out of the woodwork and want copies, he has provided no evidence whatsoever that there is a realistic prospect of more than a handful of minor parties asking for their free copy, and none is as established as the Plaintiff if any line is reasonably drawn among them.  Moreover, there is no meaningful additional burden in pressing the button to send one more email with the computerized list electronically and certainly no cost.

---

voter registration list on the same terms as the Republican and Democratic Party, might cause some sort of administrative inconvenience if it developed that a large number of political parties similarly situated also asked for a voter registration list on those same terms - even though distributing the list literally requires nothing more than typing in an email address and pressing "send."

     In the months since his motion to dismiss was denied, the Secretary and Mr. Helms have been most creative.  Somehow now Mr. Helms has discovered (read: concocted) a whole host of additional purported state interests the Defendant claims support this unlawful discrimination. [Compare ECF# 5-1]  It is hard to identify the most specious of the claims.  They all find no basis in fact or law and certainly provide no sufficient justification for the unlawful discrimination at issue here.

The related notion that providing the list for free to minor parties could lead to ballot overcrowding of course just demonstrates how very effective for ballot access purposes and education purposes the Defendant (and major party legislators) believe the list is and why they have decided to employ this unjustifiable discrimination.

Additionally, the claim by the Secretary of concern of any loss to Alabama's taxpayers, is belied by his provision of a free copy of the list on a monthly basis for use by other states, favoring other states' citizens over Alabama's own minor political party candidates and voters who support them, notwithstanding the Alabama voters and candidates' status as taxpayers at whose expense the statewide voter registration list is compiled.[14]

The idea that there is a state interest in subsidizing the two major parties (under the guise of political stability) is so far beyond the pale and so blatantly contrary to the authority cited above from the Supreme Court and elsewhere, expressly against favoring the major parties at the expense of minor parties, it requires no further response.

The most remarkable and perhaps the most absurd of the newly claimed state interests, intended simply as a cheap shot is the claim at ECF# 30, Pages 39-40, that the state interest in preventing fraud justifies the discrimination at issue.  The Defendant explains that this is

---

[14]  Each of the Defendant's newly found purported state interests he attempts to use to justify the unlawful discrimination at issue in this case finds no legitimacy in reality.  *See Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019)(noting the importance of the voter registration process and the right of every citizen to a voter registration list under the NVRA and rejecting as illegitimate the State's claimed interests in seeking to limit the provision of its voter registration list solely to its own residents).  *See also Project Vote/Voting for Am., Inc. v. Long*, 682 F. 3d 331 (4th Cir. 2012)(emphasizing the importance of access to voter registration information under a series of federal statutes); *See also Judicial Watch, Inc., v. Lamone*, 2020 U.S. Dist. LEXIS 68345 (D. Md., April 17, 2020)(emphasizing the importance of public access to voter registration lists and information under federal legislation).

particularly applicable here because a former Secretary of the LPA was convicted of fraud many years ago.  The problem is, the Defendant never explains the connection between this purported state interest and the discrimination arising from giving the list for free to the major parties, while charging the minor parties over $34,000.

Is it that the interest in protecting against fraud is protected as long as the fraudster acquires the list by paying for it?  If there is a real concern about providing the list to a Party that has a person convicted of a crime in its ranks or in a leadership position, then the Defendant must immediately stop providing the list to either the Democrats or the Republicans, based on the facts reflected in this list of Democratic and Republican Party elected officials and political leaders in Alabama convicted of crimes just over the past few years:

https://en.m.wikipedia.org/wiki/List_of_American_state_and_local_politicians_convicted_of_crimes.

Finally, the idea that the State has an interest in guarding against satire [ECF# 30 at 36], is as dangerous a proposition as it is absurd and nonsensical.  Plaintiff will spare the Court a presentation of major party candidates who have used satire through our history and the significant accomplishments of the "Know Nothing" Party that won gubernatorial elections in at least 10 states in the 1800s.

In short there is no basis for the claimed interests nor any evidence to support them and even if they were they do not in any way address or justify the unlawful discrimination and violation of the Plaintiff's First and Fourteenth Amendment rights.  The voter registration cases cited herein and any fair application of *Anderson/Burdick* analysis must lead clearly to the conclusion that the Defendant's motion must be denied and judgment should be entered in

Plaintiff's favor under Rule 56(f)(1).

Plaintiff wishes to make it clear that is contention is that "strict scrutiny" analysis should apply requiring a showing of "compelling state interests" and the use of "least restrictive means" to justify the severe burden this discrimination effects on the Plaintiff.  In any event, the Defendant has not and cannot make a showing of even a rational, let alone important or compelling state interest to justify this blatantly unlawful discrimination at issue here.

### CONCLUSION

Smaller or minor political parties have played a significant role in the American political system through our nation's history.  As the United States Supreme Court wrote over 30 years ago, in striking down, on Equal Protection grounds, a provision of Illinois law that discriminated against minor parties and independents:

> The States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation. Abolitionists, Progressives, and Populists have undeniably had influence, if not always electoral success. As the records of such parties demonstrate, an election campaign is a means of disseminating ideas as well as attaining political office.

*Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979); *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1352-53 (N.D. Ga. 2016), *affirmed by Green Party of Ga. v. Kemp,* 2017 U.S. App. LEXIS 1769 (11th Cir., February 1, 2017); *See also*, J. David Gillespie, *Challengers to Duopoly, Why Third Parties Matter in American Two-Party Politics* (University of South Carolina Press 2012 ed.). [Exhibit 4]; Adams, James, and Samuel Merrill. "Why Small, Centrist Third Parties Motivate Policy Divergence by Major Parties." The American Political Science Review, vol. 100, no. 3, 2006, pp. 403–417. JSTOR,

www.jstor.org/stable/27644363.

Based on all of the foregoing and the decisions cited herein, representing almost fifty years of jurisprudence recognizing that a claim challenging the discriminatory practice of providing voter registration lists for free to major political parties while charging minor political parties a high fee for the same list violates the Plaintiff's fundamental constitutional rights under the First Amendment and the Equal Protection Clause of the United States Constitution, Defendant's Motion for Summary Judgment must be denied.  Summary judgment must be ordered in favor of the Plaintiff under Rule 56(f)(1) of the Federal Rules of Civil Procedure.

Respectfully Submitted.

_____
/s/ David I. Schoen (ASB-0860-O42D)
Counsel for Plaintiff

**Certificate of Service**

I hereby certify that on this 28th day of May, 2020, I have caused a true and correct copy of the foregoing Response and exhibits to be served on all counsel of record by filing the same through the Court's ECF system.

_____
/s/ David I. Schoen (ASB-0860-O42D)
Counsel for Plaintiff

David I. Schoen
Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone:  334-395-6611
Facsimile: 917-591-7586
E-Mail: Dschoen593@aol.com
        Schoenlawfirm@gmail.com